### HERMAN SEGAL v. ST. LOUIS SOUTHWESTERN RAILWAY COMPANY.

#### Decided April 16, 1904.

**Carrier of Passengers—Assault on Lady Passenger.**

While plaintiff's wife was traveling in a lighted passenger car at night it stopped at a regular station for a short period, during which time, the employes being temporarily absent from the car, a negro entered the car from the outside and finding plaintiff's wife alone in the car and asleep made an assault on her. Held, that the railway company was not liable therefor, since the assault was, under the circumstances, so unreasonable and out of the ordinary that it could not have been contemplated by a prudent person.

Appeal from the District Court of Hopkins. Tried below before Hon. H. C. Connor.

*Todd & Armistead, H. L. Norwood, Scott & Head,* and *V. M. Clark,* for appellant.

*E. B. Perkins, Glass, Estes, & King,* and *Templeton, Crosby & Dinsmore,* for appellee.

RAINEY, CHIEF JUSTICE.—The following, taken from appellant's brief, states the nature and result of the suit, viz.: "This suit was instituted by appellant, Herman Segal, to recover damages for personal injuries inflicted upon his wife, Yetta Segal, by reason of an assault committed upon her person while she was a passenger on defendant's train. The defendant pleaded general demurrer and general denial. The general demurrer was presented and overruled by the court. After all plaintiff's testimony was introduced, defendant moved the court to direct a verdict for defendant, which motion was granted and the jury instructed to render a verdict for defendant. Plaintiff appeals, and assigns as error this action of the court."

The evidence on the part of plaintiff showed the following facts: The plaintiff's wife, a white lady, on March 9, 1902, was a passenger on defendant's train from Dallas to Texarkana, occupying a first-class reclining chair car, reserved exclusively for white passengers. She was accompanied by her little daughter, about 4 years old. The train was a night train. At Sulphur Springs the last of the other passengers on the car left the train, and she and her little daughter were left the only remaining passengers in the car. The railway porter or brakeman arranged the reclining chair for her to sleep, and she went to sleep. When the train stopped at Naples, about 5 o'clock in the morning, then before daylight, she was awakened by being seized by the throat and her skirts lifted up. Her assailant was a young negro man. He choked her so that she could not make an outcry, but she struggled with and resisted him until the train started, when he desisted and fled. She was entirely alone in the car, and defendant's employes knew this; yet

they had all left the car before or at the station, and left the doors of the car open or unlocked. The negro had entered through one of the doors and escaped from the door.

The following testimony given by plaintiff's wife shows substantially all that occurred, viz.: "The first thing I knew, I was awakened by a darky and he was choking me and my skirts were up. That was the first thing I knew, being waked by him and his fingers against my throat, and I had to struggle with him to get him off. I have no idea how long that continued, but still I know my struggle was fierce to keep him off. I had to use all my strength to keep him off and a great deal more. I was defending myself against a brute. He left the coach as the train was beginning to move, and I started to the back of the coach and I met the brakeman, and when I was able to explain to him what happened, he did all he could for me and got me some water and bathed my head with cool water, and he asked me to give him a description of the darky, which I did, and he said he thought he knew who it was. And then the conductor came in and I told him. I refused to stay in the coach any longer by myself, so he brought in a lady and gentleman to stay with me until we got to Texarkana." That she saw and identified her assailant at Naples two or three days after that time. As soon. as the train started to move the negro got out of the car. He got off. "I did not see him on the car prior to the time I woke up. This assault must have been just before 5 o'clock a. m. I can not tell whether it was before 5 o'clock or afterwards. It was not daylight. It was really dark. He started to run out of the car as soon as the train started to move. I was asleep when the train reached Naples. I did not know when the train started. The train was standing still when I woke. When I woke up the negro had his hands on my throat. I do not know which hand he had on my throat. He was choking me. He had his two thumbs pressing up against my tonsils. When I woke up he had his two hands up against my tonsils, pressing against them. I am positive of that as I am of anything I have testified to to-day. The next thing he did was to try to choke me insensible. He did not take his thumbs away from my throat until the train started. My skirts were raised before I ever knew it. I do not know when he raised my skirts. When he took his two thumbs away from my throat I do not know that he did anything. He was trying to choke me insensible when I woke up, and my skirts were raised and he was choking me. He took his thumbs away when the train started to move. When he took his thumbs away from my throat and the train started to move he started to run. Immediately he took his two thumbs away from my throat he ran. He was pressing his thumbs up against my throat so hard that I could not scream. I did not call out or make any noise because he pressed my throat so hard that I could not. His hands pressing on my throat is what woke me up. I did not wake up when he raised my skirts that I know of. I might have been half awake, but was not awake enough to know what was going on. When I did wake up he had both hands up to my

throat. He pressed hard enough to cut off my breath. It did not hurt my throat enough to cause me pain. Afterwards it was just sore on the inside. At the time he was pressing against my throat it did hurt me. I did not stop to examine whether or not it left any sign on the outside, because I was too frightened. There was no sign on my throat. At the time the negro assaulted me he either had on rubber shoes or was in his sock feet, and as soon as he left the car I did not jump up because I could not. It was a few minutes before I could get up. I was too badly frightened to notice how long it was. When I did get up I started back to the rear end of the coach and met the brakeman coming in from the rear car from the outside. He was on the outside when I first saw him and he walked on in the coach where I was and I told him what had happened, and he got me a drink of water and wet his handkerchief for me and did all he could for me after I told him what had happened. I do not know on which side the negro come in the coach, for I was asleep when he come in. He went out towards the front end of the car towards the engine. I could not form any idea how far the train had moved before I saw the brakeman. The negro that assaulted me did not stop in the car, but ran out of the car door. He went out of the car door, for it was open, and he disappeared from my sight and I did not see him any more until I saw him at Naples, on the third day after that. The brakeman brought the train porter in, in order that I might see if he was the one that assaulted me. I did see the train porter before getting to Texarkana. I do not know whether he was a very black negro or not. I know he was not the one that assaulted me.

The testimony further shows that aside from the terror and humiliation produced, that serious and permanent physical injuries resulted to her.

The only question presented is whether or not the facts authorized the trial court in instructing a verdict for defendant. We think that this should be answered in the affirmative. "The duty of the carrier to protect passengers from the assaults and insults of third persons arises only when the threatened wrong occurs in the presence or within the knowledge of its agents, or when, from the facts and circumstances attending or preceding the injury, the carrier might have foreseen and prevented it." Prokop v. Railway Co., 34 Texas Civ. App., —, and authorities there cited. No employe of appellant was present when the assault was committed upon plaintiff's wife, nor do the facts show any such condition existing at the time from which said employes ought reasonably to have anticipated or foreseen the assault and guarded against it. The Prokop case, cited above, in which a writ of error was refused by the Supreme Court, is decisive of the question here presented. If any difference it is a stronger case against the company than this. In that case the plaintiff's wife had entered the company's depot to take passage on its train. The train was late, night came, and the company's employes failed to light the waiting-room and they left

the depot, and while plaintiff's wife was there alone in the dark she was assaulted.

It was held no recovery could be had. In this case plaintiff's wife was on appellant's train, in a lighted car. It stopped at a regular passenger station for a short period, when the assault was committed. The company's employes were not in the coach, and their absence at this time can not be considered such negligence as would warrant a recovery. That an assault would be made under such circumstances was so unreasonable and out of the ordinary that it could not have been contemplated by a prudent person.

It is insisted by appellant that under article 4509, Revised Statutes, it was negligence per se for appellee to have permitted the negro to enter the coach and remain there the time he did.

This contention we think untenable. Under the facts we can see no possible bearing that said statute can have on this case.

The judgment is affirmed.

*Affirmed.*